\02_A\LIAB\JIP\LLPG\631854\TAE\04108\00334

**MARSHALL, DENNEHEY, WARNER,**
**COLEMAN & GOGGIN**
**BY:** Joseph J. Santarone, Jr., Esquire
ID#  45723
Suite 1002, One Montgomery Plaza
Norristown, PA   19401
(610) 292-4444

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTONIO D. WATSON AND TONY TIX, INC.,  : | NO:  01-CV-5501 |
| GERALD W. KELLY, JUST JERRY'S, INC.,         : | |
| AND ROBERT KENNEDY                                    : | |
|                                                                          : | |
|                    V.                                                   : | |
|                                                                          : | |
| ABINGTON TOWNSHIP, ABINGTON            : | |
| TOWNSHIP POLICE DEPARTMENT, WILLIAM : | |
| J. KELLY, CHIEF, DETECTIVE RICHARD      : | |
| KONDON, DETECTIVE JOHN PARKS, AND    : | |
| DETECTIVE ANTHONY AMMATURO            : | |

### O R D E R

IT IS HEREBY ORDERED that upon consideration of Defendants, Abington Township,  Abington

Township Police Department, William J. Kelly, Chief, Detective Richard Kondon, Detective John Parks and

Detective Anthony Ammaturo's Motion for Summary Judgment and any Responses thereto, it is ORDERED

that Defendants, Abington Township, Abington Township Police Department, William J. Kelly, Chief,

Detective Richard Kondon, Detective John Parks and Detective Anthony Ammaturo's Motion is GRANTED

and any and all claims against them  are dismissed with prejudice.

---

U.S.D.C., J.

**MARSHALL, DENNEHEY, WARNER,**
**COLEMAN & GOGGIN**
**BY:** Joseph J. Santarone, Jr., Esquire
ID#  45723
Suite 1002, One Montgomery Plaza
Norristown, PA    19401
(610) 292-4444

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANTONIO D. WATSON AND TONY TIX, INC.,   :        NO:  01-CV-5501
GERALD W. KELLY, JUST JERRY'S, INC.,          :
AND ROBERT KENNEDY                                    :
                                                                          :
              V.                                                         :
                                                                          :
ABINGTON TOWNSHIP, ABINGTON              :
TOWNSHIP POLICE DEPARTMENT, WILLIAM :
J. KELLY, CHIEF, DETECTIVE RICHARD        :
KONDON, DETECTIVE JOHN PARKS, AND       :
DETECTIVE ANTHONY AMMATURO               :

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS, ABINGTON TOWNSHIP, ABINGTON TOWNSHIP POLICE DEPARTMENT, CHIEF WILLIAM J. KELLY, DETECTIVE RICHARD KONDON, DETECTIVE JOHN PARKS AND DETECTIVE ANTHONY AMMATURO

Defendants, Abington Township, Abington Township Police Department, Chief William J. Kelly,

Detective Richard Kondon, Detective John Parks and Detective Anthony Ammaturo, by and through their

undersigned counsel, Marshall, Dennehey, Warner, Coleman & Goggin and Joseph J. Santarone, Jr., Esquire

file this Motion for Summary Judgment and aver:

1.  Plaintiffs instituted this case by filing a Complaint in October of 2001.  (A copy of Plaintiffs'

Complaint is attached hereto as Exhibit "A").

2.  Plaintiffs' Complaint alleges a claim for violation of their Civil Rights pursuant to 42 U.S.C. §1983

and various state law claims arising from the incidents in Abington Township.

3. Defendants filed an Answer to the Complaint with Affirmative Defenses denying any and all liability. A copy of Defendants' Answer with Affirmative Defenses is attached as Exhibit "Y."

4. For the reasons more fully set forth in the Memorandum of Law, which is attached hereto and incorporated herein by reference, there are no issues as to any material facts and defendants are entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56.

WHEREFORE, Defendants, Abington Township, Abington Township Police Department, Chief William J. Kelly, Detective Richard Kondon, Detective John Parks and Detective Anthony Ammaturo respectfully request that this Honorable Court grant their Motion for Summary Judgment and dismiss the Plaintiffs' Complaint with prejudice.

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN

  s/JS1015

JOSEPH J. SANTARONE, JR., ESQUIRE
Attorney for Defendant
Suite 1002, One Montgomery Plaza
Norristown, PA   19401
610-292-4444 (Phone)
610-292-0410 (Fax)
jsantarone@mdwcg.com
PA45723

\02_A\LIAB\JIP\LLPG\631854\TAE\04108\00334

**MARSHALL, DENNEHEY, WARNER,**
**COLEMAN & GOGGIN**
**BY:** Joseph J. Santarone, Jr., Esquire
ID# 45723
Suite 1002, One Montgomery Plaza
Norristown, PA   19401
(610) 292-4444

_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTONIO D. WATSON AND TONY TIX, INC., : | NO:  01-CV-5501 |
| GERALD W. KELLY, JUST JERRY'S, INC., : | |
| AND ROBERT KENNEDY : | |
| : | |
| V. : | |
| : | |
| ABINGTON TOWNSHIP, ABINGTON : | |
| TOWNSHIP POLICE DEPARTMENT, WILLIAM : | |
| J. KELLY, CHIEF, DETECTIVE RICHARD : | |
| KONDON, DETECTIVE JOHN PARKS, AND : | |
| DETECTIVE ANTHONY AMMATURO : | |

### MEMORANDUM OF LAW

**I.** **STATEMENT OF FACTS:**

**A.** **Players**

**The Plaintiffs**

**Antonio Watson**

Antonio Watson was the owner of Tony's Tix.  Tony's Tix was located adjacent to Just Jerry's Tavern in

Abington, Pennsylvania.  He, along with Gerald W. Kelly and Robert Kennedy, are alleging a wide array

violations of their constitutional rights along with various state law claims.  Specifically, Antonio Watson is

alleging that the Abington Township Police Department executed an invalid search warrant predicated upon

information that the Abington Police Department knew to be false.  Watson also alleges that the execution of

the search warrant stemmed from the racial animus that the Abington Police Department had for him because he

is an African American.

Watson alleges that the execution of the search warrant caused Tony's Tix to go out of business. Allegedly Jerry Kelly was planning to sell his business The Scoreboard to Watson. Watson believes that the Moving Defendants conspired to destroy Gerald Kelly's business "The Scoreboard" because the defendants had learned that Jerry Kelly intended to sell the bar to an African American.

**Gerald Kelly**

Gerald Kelly ("Jerry Kelly")retired from the Abington Police Department as a lieutenant in 1993. Upon his retirement, Gerald Kelly became the owner of the Scoreboard restaurant and bar.  The Scoreboard was located adjacent to Tony's Tix in Abington Township.  Gerald Kelly alleges that Abington Township Police Department ("APD") conspired to drive him out of business and to prevent the sale of Just Jerry's to Antonio Watson because Antonio Watson is African American.  Jerry Kelly alleges that the Abington Police Department targeted the Scoreboard for underage drinking sweeps and set up Driving Under the Influence (DUI) checks near his restaurant because the APD did not want an African American owning a bar in Abington.

**Robert Kennedy**

Robert Kennedy was an employee of Tony's Tix and, at times, the Scoreboard.  Robert Kennedy alleges that the racial animus of the Abington Township Police Department resulted in his financial loss as he allegedly lost his employment because of the execution of the search warrant on Tony's Tix. Additionally, Robert Kennedy believes that the APD arrested him for threatening to kill Detective Richard Kondon in an attempt to have him provide information about Antonio Watson's criminal activities.

## The Defendants

**Chief William J. Kelly** has been Abington Township Police Chief for the last 18 years.  He was the police chief for all the relevant events that form the basis of this complaint.

**Detective Richard Kondon** is a member of the Abington Police Department. He was the chief investigative officer for the investigation of Antonio Watson's involvement in the cashing of a fraudulent check in the amount of $800,000 and the criminal activity at Tony's Tix.

**Detective  John Parks** is a member of the Abington Police Department. He investigated one complaint against Antonio Watson for theft by deception at Tony's Tix.

**Detective Anthony Ammaturo** is a member of the Abington Police Department. He was in charge of the investigation of Robert Kennedy when Antonio Watson reported that Kennedy had threatened to kill Detective Richard Kondon.

**B.**     **Statement of Facts**

**1. Overview**

Plaintiffs in this case allege that responding defendants violated their constitutional rights and committed several state law torts for which they seek relief.  Specifically, plaintiffs allege that their Fourth and Fourteenth Amendment Rights were violated.  Plaintiff Kelly's Fourth Amendment claims were dismissed by this Court.  The remaining state law claims include malicious prosecution, commercial disparagement and intentional infliction of emotional distress.  (Plaintiff's Complaint attached as Exhibit "A")

Antonio Watson was an owner and operator of a business named Tony's Tix.  Tony's Tix was involved in the selling of concert and theatre show tickets.  The building was attached to the co-plaintiff Jerry Kelly's bar the Scoreboard.  Although Antonio Watson claimed that his business was highly profitable and successful, it is clear from his financial records that Tony's Tix was not a successful enterprise.  (Report of Marc Weinstein, forensic accountant, attached as Exhibit "B").  Sometime in 1998, the plaintiffs allege that Jerry Kelly and Antonio Watson reached an agreement to have Jerry Kelly sell his bar to Antonio Watson.  In his deposition testimony, Jerry Kelly alleged that he was selling the bar because his business was suffering because of underage drinking sweeps in the area.  (Gerald  Kelly 87-12).  At this point, the Abington Township Police

Department had no knowledge of who Antonio Watson was.  Specifically, the first time Chief Kelly or any of the defendants had any knowledge of Antonio Watson was when Antonio Watson reported a shooting near his residence in May 10, 1999.  (Chief William Kelly 72-3).

### 2. Defendant's knowledge of the relationship between Gerald Kelly and Antonio Watson

Plaintiff's complaint alleges that all defendants who were aware of the social and professional relationship between plaintiffs, Watson, Tony's Tix and Gerald W. Kelly and The Scoreboard Restaurant.  At no point in any of the defendants' depositions did they claim to have any knowledge of Antonio Watson prior to May 10, 1999.  As a point of reference, this was the date that Antonio Watson reported that he was shot at near his residence at The Colonnade Apartments in Abington.  Detective Kondon testified specifically that he had no knowledge of Antonio Watson prior to May 10, 1999.  (Detective Richard Kondon 178-222)  Furthermore, Detective Kondon testified that he had no knowledge of negotiations concerning Antonio Watson and Gerald W. Kelly regarding the selling of The Scoreboard Restaurant from Kelly to Watson.  Chief William Kelly testified the first time he heard of Antonio Watson was May 10, 1999.  The reason for this was because a shooting is an unusual event in Abington Township and he took notice of it.  Detective John Parks' first contact with Antonio Watson was in October of 1999.  (Detective John Parks 9-10)  That was in relation to a complaint filed by Victoria Slinger against Mr. Watson for her Visa bill charging an additional $400.00 above and beyond the cost of the tickets she purchased from him.  Detective Anthony Ammaturo's first contact with Antonio Watson was roughly the same time as Detective Kondon's.  They were both involved in investigating the alleged shooting incident on May 10, 1999.  (Detective Anthony Ammaturo 22-14).

These undisputed facts completely undermine plaintiffs' contention that there was a systematic effort to deprive African American males their rights in Abington Township. The allegation that Abington Township was interested in frustrating the sale of The Scoreboard Tavern to Antonio Watson is completely without merit and Plaintiffs have come forward with no proof to support that claim.

### 3. <u>May 1999 shooting incident</u>

Antonio Watson's first interaction with the Abington Township Police Department centered around a shooting incident that allegedly involved persons that were involved in a fraudulent checking scheme. Antonio Watson was investigated by both the Federal Bureau of Investigation and later by the Abington Township Police Department for his potential involvement. Specifically, an $800,000.00 check was cashed on the account of Sam Braccia. The check had been given to Antonio Watson by his attorney, Richard Patete, allegedly in payment for a personal injury lawsuit that Antonio Watson had filed. The check was drawn against Attorney Patete's account and there were insufficient funds to pay the check. Regardless, the check was paid and cash was distributed to Sam Braccia and Antonio Watson (*Philadelphia Daily News* article, March 16, 2001 attached as Exhibit "C").

Antonio Watson has given three separate accounts of what exactly occurred on the night of the May 10, 1999 shooting. The discrepancies in his testimony have been laid out in previous pleadings before this Court. Antonio Watson's statements concerning this even are an excellent illustration of his veracity. In particular, Antonio Watson alleges that he was shot in May of 2001 by potentially the same people that shot at him in May of 1999 because the Abington Township Police Department failed to investigate the May 1999 shooting because it is racist. Watson alleges that he was in Frankford Torresdale Hospital for three to four weeks in May of 2001 recovering from his gun shot wounds. (Antonio Watson 373-8). The records are definitive that Antonio Watson never was a patient at Frankford Torresdale Hospital. (Frankford Torresdale affidavit of "No Records" attached as Exhibit "D").

### 4. <u>The Scoreboard, DUI checkpoints and underage drinking sweeps</u>

Jerry Kelly alleges that once the APD found out that he intended to sell his business to Antonio Watson they conspired to drive him out of business through a series of DUI checks in the immediate area around his business and underage drinking sweeps. As indicated earlier, Abington Police had no knowledge of Antonio

Watson and no dealings with him before May 10, 1999.  It is ludicrous for the plaintiff to claim that the DUI check points were for the purpose of preventing Kelly from selling the business to Antonio Watson.  As the attached documentation shows, these check points were collaborative efforts between Abington Township, Cheltenham Township, Lower Moreland and Upper Moreland (Attached as exhibit "E").

The program was begun well before Antonio Watson was even known to the police and began on March 21, 1996.  This is over three years before the police had any knowledge of or contact with Antonio Watson.  The extensive documentation shows that from 1996 to 1999, there were 37 check points done by these municipalities.  Of those 37 check points, only four of them were in the area of the Scoreboard.  They were on June 13, 1997;  April 3, 1998;  July 3, 1998;  and March 28, 1998.  All of these preceded the Abington Police Department's first interaction with Antonio Watson, which occurred on May 10, 1999.

The first three check points were set-up in the area of the library parking lot.  This parking lot is located one block south of The Scoreboard on York Road, in Abington Township.  There was a reference made in the depositions of the parties that a DUI check point was set-up directly at the intersection of Susquehanna Road and York Road.  This is the busiest intersection in Abington Township.  This is the same check point that was referenced as the one where police lights were shining on The Scoreboard.  This, plaintiffs allege, had a chilling effect on their business.   This particular checkpoint was conducted on August 28, 1998. This checkpoint preceded any knowledge by any of the Defendants of Antonio Watson.

The records also show that the police were called to The Scoreboard and the surrounding parking lot far more frequently than any other business in Abington Township.  There were numerous incidents of fights in the parking lot, disturbances, etc., to which the police responded.  Jerry Kelly's allegations that there seems to be a heightened police presence around the area of The Scoreboard is attributable to the fact that Abington Police responded to 59 incidents in 1998 (which pre-dates any involvement or knowledge of Antonio Watson), 64 in 1999 and 37 in the year 2000.  (Incident Reports attached as Exhibit "F").  The allegation that the purpose

behind the underage drinking sweeps was to drive The Scoreboard out of business and prevent Kelly from selling the business to Antonio Watson is simply unsupported by the facts.

The underage drinking sweeps were funded pursuant to a grant provided by the Commonwealth of Pennsylvania.  (Attached hereto as Exhibit "G")  There was a growing awareness and concern in Abington Township, the Commonwealth of Pennsylvania and the United States with underage drinking.  As Mothers Against Drunk Drivers and other organizations raised the level of concern, Abington Township, through the efforts of such organizations obtained a grant from the Juvenile Justice Commission, which included expenditures of $7,500 for law enforcement officials to conduct sweeps  twice per year of problem bars in the municipality.

The sweeps themselves were conducted at the direction of Lt. Peter Hasson.  (Peter Hasson 40-7).  Lt. Hasson was charged with the supervision of these bar sweeps pursuant to the terms of the state grant.  He specifically mixed up when and where the sweeps for underage drinking would occur so that there would not be any basis in allegations that people were being raided more frequently than other bars in the township.  (Peter Hasson 85-22).  Peter Hasson is now the Chief of Police for Lower Moreland Township.  Although he was in charge of where and how the raids would be conducted in Abington Township he has not been named as a defendant in this case.

Moving defendants have produced documentation from the underage drinking sweeps that illustrates that  on each occasion that there were numerous other bars that were also checked.  Also, the order of the bars that were checked varied.  On one occasion, The Scoreboard was the first bar checked.  On another occasion, it was the last bar checked.  On yet another occasion, it was in the middle.  (Attached as Exhibit "H").  What the record shows is that there were far more underage drinkers found in The Scoreboard than any other bars that were swept.  The dates of the sweeps were May 20, 1999, December 17, 1999, August 3, 2000 and November 16, 2000.

It is important to note that the terms of the grant provided for two sweeps per year.  On May 20, 1999, the records indicate that there were nine underage drinkers found at The Scoreboard.  As a result of that sweep, Karen Hearn from Pennsylvania Liquor Control Enforcement interviewed the individuals who were detained on that date.  They communicated to Karen Hearn that they had drank at The Scoreboard in the past.  On December 17, 1999, the Liquor Control Board accompanied Abington Police on a sweep.  On that date, The Scoreboard was the last bar they visited and there were no underage drinkers found.  On August 3, 2000, five underage drinkers were found at The Scoreboard.  The final sweep was done on November 16, 2000.  In light of these facts, plaintiff's allegation that Abington Township intentionally drove him out of business to prevent him from selling his business to an African American is on its face absurd.  The evidence and Jerry Kelly's own deposition testimony show that he made the decision to sell the business to anyone prior to Abington Police even knowing who Antonio Watson was.  (Gerald Kelly 87-11).

The sweeps for underage drinkers all occurred in the evening as were the checks at every other bar which were conducted in Abington Township.  Jerry Kelly was never there for any of the age checks.  He was an absentee owner who was never there at night.  His partner, Angelo Evangelista, who had been in business with him, left the business in 1995.  (Gerald Kelly 71).  Kelly had bought a business which from 1965 until he purchased it in 1983 had changed owners five times.  There is now a sixth owner at the location.  By 1999, Jerry Kelly had no employees who had been with him from the time the business opened.  This is not the profile a steady, thriving business.

Plaintiff's claim that Antonio Watson's Tony's Tix was the only African American who  operated a business in the "Abington section."  But their definition of the "Abington section" is limited to one block.  More significantly, plaintiff does not know of any African American who tried to open or operate a business in the Abington section who claimed they were discriminated against.  (Gerald Kelly 52).  Of note is that one of the largest businesses in Abington Township is Fairway Cadillac and that is owned by an African American.  Kelly

acknowledged that he never heard any complaints from the owner of this large dealership and that the owners of that dealership were never discriminated against by Abington Township. (Gerald Kelly 53). Kelly goes on further to acknowledged that he never heard any complaints by any business owned by African Americans that they were discriminated against by Abington Township. Additionally, Kelly did not hear of any complaints that anyone ever tried to open a business and that they were discriminated against. (Gerald Kelly 53). Lastly, a business which is located immediately next door to The Scoreboard in the Abington section was and still is operated by a minority (an Asian). There has been absolutely no evidence produced of a custom, policy or practice of discriminating against African Americans in Abington Township. To the contrary, the opposite has been proven.

The reputation of both Abington Township and the Abington Township Police Department among the African American community and in dealing with race related issues has been exemplary. Attached are two affidavits from individuals who have a great deal more knowledge regarding Abington Township Police, Chief William Kelly and their dealings with the African American community than the plaintiffs in this case. Dr. Donald L. Clarke is the President of the Local Chapter of the NAACP while Joanne Weaver Stroh is the Head of the Human Relations Committee. Both will testify as to the excellent relationship that Abington Township and Chief William Kelly have with minority communities (Affidavit of Donald L. Clark attached as Exhibit "I"/Affidavit of Joanne Weaver Stroh attached as Exhibit "J").

Additionally, Chief William Kelly has received two awards in recognition for his work in the African American community. Specifically, in 1998, he was recognized with an award for his contributions in community for policing relations by the Willow Grove NAACP. (Attached as Exhibit "K"). In May of 2002, the United States Congress presented him with a Certificate of Special Congressional Recognition. (Attached as Exhibit "L"). The Equal Opportunity Award was given to Chief Kelly by the United States Congress in recognition of his outstanding and invaluable service to the community.

**5. <u>Search warrant and subsequent arrest of Antonio Watson</u>**

Plaintiffs, Antonio Watson alleges that his Fourth Amendment rights were violated during the execution of a search warrant of Tony's Tix on February 18, 2000.  Watson additionally states that the charges were dismissed against him.  However, the charges were not dismissed.  Rather were placed in suspense pending Antonio Watson's providing restitution for the funds that were stolen from the various customers of Tony's Tix.  To date, Antonio Watson has failed to provide restitution to the complainants in this matter.  (Affidavit of Marcy Toepel, Chief Deputy, Clerk of Courts, Montgomery County Court of Common Pleas attached as Exhibit "M").  On November 5, 2004 Antonio Watson is scheduled to appear in Court to answer why he has not honored the agreement to provide restitution pursuant to his agreement with the Court.

The investigation conducted by Detective Kondon clearly supported the search warrant which was used as authority to search Tony's Tix (Attached as Exhibit "N").  There were a number of complaints concerning financial irregularities at Tony's Tix  reported to Abington Township Police Department both before and after the execution of the search warrant.  (Attached as  Exhibit "O").  The timing of the search of Tony's Tix was dictated by the fact that the police learned that Tony's Tix was going out of business due to financial difficulties. The police were concerned that the records which would have supported the complaints would be destroyed should Tony's Tix go out of business before the search warrant was executed.  Accordingly, the search warrant was executed on February 18, 2000 and the files, computers and other belongings at Tony's Tix were seized pursuant to the valid warrant.

On January 26, 2000, Detective Richard Kondon learned that Tony's Tix was in financial difficulty.  He learned this through conversation he had with both Richard Patete and Robert Kennedy. ( January 26, 2000 police report attached as Exhibit " P").  Both Patete and Kennedy told Detective Kondon that their lives were threatened when they attempted to execute a lien that had been placed on Tony's Tix's computer.  Antonio Watson had run up significant debt on Robert Kennedy's American Express card and, in order to be reimbursed

for these charges, Robert Kennedy sought a judicial order in order to seize the computer of Antonio Watson. When Richard Patete and Robert Kennedy went to seize this computer with the help of a Constable, Patete and Kennedy alleged that their lives were threatened.   Kennedy and Patete went to the Abington Township Police Department and reported these threats on their lives.   In light of the fact that there were a number of criminal complaints pending against Tony's Tix and this new found information regarding significant financial problems, Detective Kondon decided to execute the search warrant as soon as possible.

Plaintiff alleges that the seizure of the computers and other work related material at Tony's Tix caused Tony's Tix to go out of business.   However, it is clear that Tony's Tix was not doing well at that time. Specifically, a co-plaintiff in this case, Robert Kennedy had a lien against the  computer at Tony's Tix. Antonio Watson did not have any property interest in the computer as it was attached by a lien held by Robert Kennedy (attached as exhibit "Q").   Consequently, Watson's position that the seizure of the computer violated his Fourth Amendment rights is called into question because he had no property interest in the computer.   To argue that the police caused his business to fail because of the Moving Defendant's racial animus (which does not exist) belies the fact that Antonio Watson's business was in such a state that a former employee held a lien against his computer in which Watson had no interest.

Robert Kennedy was an employee at Tony's Tix before Tony's Tix went out of business.   Kennedy fails to acknowledge and should be the subject of sanctions because he had been fired from Tony's Tix before the February 10, 2000 execution of the search warrant on Tony's Tix.   Antonio Watson, in his deposition, testified under oath that he had fired Robert Kennedy.  (Antonio Watson 325)  He also said that three of the Tony's Tix employees had cocaine problems and that he saw Robert Kennedy doing cocaine in the business. (Antonio Watson 324).  He also said that employees, Bruce Pfeiffer, Dennis Conwell and Robert Kennedy were "coke fiends" and those individuals were stealing from him doing cocaine and fraudulently charging customers' credit

cards.  (Antonio Watson 322).  Despite the fact that these were his employees, he makes the allegation that the reason he went out of business was because of the execution of the search warrant on February 10, 2000.

The execution of the search warrant was the result of complaints made to the Abington Police Department by numerous people regarding the fact that they had paid for tickets and not received them. Alternatively, other people claimed that amounts had been charged to their credit cards far in excess of what should have been charged. At first, Detective Kondon attempted to work with Antonio Watson by acting as a middleman to see that restitution was paid to the victims who were making the complaint.  Yet a number of complaints continued to grow along with the suspicion regarding Antonio Watson's dealings.

Abington Township had been contacted by the F.B.I. regarding the aforementioned $800,000 check which had been fraudulently written on the account of Richard Patete and made payable to Antonio Watson. On March 2, 1999, Antonio Watson, Sam Braccia and Vince Braccia cashed an $800,000 check at the Willow Grove Bank that had been written by Attorney Richard Patete.  He only had a nominal amount in his account and the F.B.I. began investigating the bank's $800,000 loss.  In addition to that money, between August, 1997 and March, 1998, Watson reported to the F.B.I. that Sam Braccia had given him about $480,000.  In addition to the $800,000 check, Watson had put about $50,000 of it into Tony's Tix's business.  What is obvious is that money coming into Tony's Tix was not from the sale of tickets, but from the proceeds of the fraudulent check or money that Sam Braccia had given him.

Contemporaneously, the Abington Police Department, the Better Business Bureau of Montgomery County and the Pennsylvania Attorney General's Office were all receiving complaints about the dealings of Tony's Tix. Both the execution of the search warrant at Tony's Tix and the subsequent arrest of Antonio Watson were approved by Detective Kondon's supervisor, Detective Sergeant William Holt. Detective Sergeant Holt is an African-American.  (Affidavit of Detective Sergeant William Holt attached as Exhibit "R").

There are a number of reasons why the search warrant was executed on February 10, 2000.  First, the number of complaints continued to grow and there were questions as to whether there was some money laundering going on at Tony's Tix as a result of claims of large amounts of money being put into the business and personally to Tony's Tix by a Montgomery County builder, Sam Braccia.  Secondly, Robert Kennedy had come to the Abington Township Police Department with a lien that he had against the property of Tony's Tix which included the computer of Tony's Tix for February 10, 2000.  The argument can be made that Watson, part of his complaint being that he lost his computer, had no property interest in the computer at the time of the search warrant because Robert Kennedy had a valid lien against it. Kennedy claimed that when he went to seize the property himself, he was threatened by Antonio Watson.  Kennedy then went to the Abington Township Police Department seeking help.  The last factor that supported the search warrant is that Detective Kondon and the Abington Police had been told that Tony's Tix was going to change hands in the next week or so and if there was any information that they needed to prosecute the claims in light of the complaints being brought, they needed to seize the evidence quickly.

## 6. Relations between Antonio Watson and Robert Kennedy

There is a history between Antonio Watson and Robert Kennedy that is relevant.  In July of 1999, Kennedy went to the Abington Township Police Department to complain that someone was fraudulently using his credit card.  (Robert Kennedy 59-60).  He claimed that he had charged thousands of dollars onto the credit card without his permission.  The bills that Mr. Watson had rung up on his credit cards were never paid and Kennedy filed for bankruptcy.  (Robert Kennedy 63). While at the Police Station to make a complaint about Watson, Kennedy found out that Watson had alleged in a statement to the Abington Township Police Department that Kennedy had threatened to kill a Police Officer (Attached as Exhibit "S").  At that time, Kennedy found out that there was a warrant for his arrest.

Antonio Watson claims that he had tremendous income stream from Tony's Tix.  Despite this claim, he could not get a credit card in his name.  That is why the credit card that he used was actually in Robert Kennedy's name.  (Robert Kennedy 62).  While Kennedy has the audacity to claim that he has a wage loss as a result of Tony's Tix closing, he cannot contradict Watson's testimony that he had fired him long before Tony's Tix had ever closed.  Kennedy himself acknowledged that while he worked at Tony's Tix, he is not sure whether or not he received a W-2.  He doesn't know what his salary was and does not remember what he made in a year.  (Robert Kennedy 74).  The employees that he names as working at Tony's Tix with him at the time were Dennis Conwell, Bruce Pfeiffer and himself.  Watson claims that all three men were stealing from him, fraudulently using credit cards and doing drugs.  After Tony's Tix went out of business, Kennedy opened a business in the same location called "Ticket Doctor."  He acknowledges that the business may have gone right from Tony's Tix to Ticket Doctor.  (Robert Kennedy 82).

Kennedy was arrested on July 28, 1999 as a result of the allegations made by Antonio Watson that Kennedy had threatened to kill Detective Kondon.  Detective Ammaturo testified that the case was continued and when it was coming up for a listing, the police did not know Antonio Watson's whereabouts.  Obviously, the case could not proceed without Watson testifying against Kennedy as to statements that he had heard and, without Watson, the charges were dismissed.  Plaintiff Robert Kennedy has opened himself up to additional investigation through sworn statements that he had made in his deposition.  Although he could not remember his salary, or whether or not he received a W-2 while working at Tony's Tix, he claimed that as  a result of working there, he received $2,000 per month in "perks."  He acknowledges in deposition that he never reported any of that as income.  (Robert Kennedy 188).

Plaintiff Kennedy claims that as a result of Tony's Tix going out of business, he suffered substantial loss and loss of earning capacity.  (Plaintiff's Complaint ¶ 94).  Antonio Watson testified in his deposition that Kennedy had been fired for drug use and other things and that after July of 1999, "Kennedy was never welcome

at Tony's Tix." (Antonio Watson 353).  Robert Kennedy's arrest was predicated on the statement that Antonio

Watson gave to Abington Police that Kennedy had threatened to harm or kill Detective Kondon.  Nevertheless,

Kennedy and Watson have now joined as plaintiffs in this case.

### 7.  Picketing incident at Tony's Tix

In further support of Antonio Watson's allegation that Abington Township Police Department is fraught

with racial discrimination, he referenced an incident where  his place of business was picketed by white

picketers.  Specifically, he alleged that the picketers carried signs that bore the words "nigger."  He alleges that

the Abington Township Police Department was somehow involved in this picketing.  Yet the facts are clear that

the picketing occurred because Antonio Watson owed a customer of Tony's Tix money.

At approximately 3:05 p.m. on September 9, 1999 Tom Mellet and two of his employees were picketing

outside Tony's Tix.  Mellet was upset because Tony's Tix had charged $1640 on his credit card and had taken

$600 in cash from him for tickets that were never delivered.  (See police report attached as Exhibit "T").  The

dispute was mediated by the APD and Tom Mellet was made whole through a credit placed on his account in

the amount of $2240.

At 5:00 p.m. on the same day Tom Mellet reported that Antonio Watson called him and threatened him.

Specifically, Mellet said that Watson told him that "you (Mellet) don't know who you are messing with" and

"you better watch yourself." (Police report attached as Exhibit "U").  From this Antonio Watson spins a story

that there were picketers carrying signs with racial epithets on them outside his store that the APD did nothing

about.

Although  Watson was not there, he claims that Jerry Kelly was present while these people were

picketing Tony's Tix.  When asked about the incident at his deposition, Jerry Kelly said that he did not go out to

take a look as to what the signs said.  (Gerald Kelly 91-97).  In effect, we have a completely unfounded

allegation that the Abington Township Police Department did nothing to stop an unlawful gathering of persons

outside of Antonio Watson's' business.  Furthermore, plaintiffs have produced no witnesses that were present during the picketing of Tony's Tix that can speak to whether or not they were even there let alone what was on the signs.  What we do have are police reports that indicate that Antonio Watson has a tenuous grasp on the truth.

## II.   STANDARD OF REVIEW:

Fed.R.C.P. 56(c) provides that "summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Affidavits, if any, show that there is no genuine issue as to any material fact and that moving party is entitled to judgment as a matter of law".  The Supreme Court has recognized that the moving party "bears the initial responsibility of informing the District Court of the basis for its motion, and identifying those portions…which it believes demonstrate the absence of a genuine issue of material fact".  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  After the moving party has filed a properly supported motion, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial".  Fed.R.C.P. 56(e).  The non-moving party may not rest upon the mere allegations or denials of the parties pleading.  If the record taken as a whole in a light most favorable to the non-moving party, "could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial".  Matsushita Elec. Company v. Zenith Radio, 475 U.S. 574, 587 (1986).  If the evidence for the non-moving party is merely colorable, or if it is not significantly probative, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

## III.   ARGUMENT:

### A.   Count I of Antonio Watson's complaint seeking relief for violation of his Fourth Amendment rights should be dismissed with prejudice

On February 11, 2000, Detectives Richard L. Kondon and Detective John Parks of the Abington Township Police Department secured a search warrant for the premises of Tony's Tix, Inc. located at 1112 Old

York Road in Abington, Pennsylvania. (Search warrant attached as Exhibit "N"). The probable cause Affidavit lists eight separate fraudulent transactions that Tony's Tix was involved with from the period of July 22, 1999 to February 8, 2000. (Probable Cause Affidavit and supporting documentation attached as Exhibit "V"). Specifically, Detectives Kondon and Parks detail in their Probable Cause Affidavit that Tony's Tix had passed two bad checks, overcharged a complainant's credit card in the amount of $1,640.00 and charged four different complainants for tickets that they never received. Based on this information, Detectives Kondon and Parks secured a search warrant from District Justice Joseph H. Dougherty, District Court 38-1-04.

Plaintiffs allege that defendants Kondon and Parks either "knew the statements in the Affidavit were false, or they had made said statements in reckless disregard for whether they were true or false. (Plaintiffs' Complaint ¶28). Furthermore, Watson contends that "he was not arrested or charged for the allegations pertaining to setting up the customers that had filed complaints. (Plaintiffs' Complaint ¶33). Lastly, plaintiffs allege that because of the search warrant, plaintiffs, Watson and Tony's Tix went immediately and completely out of business. (Plaintiffs' Complaint ¶38). Plaintiffs allege that "all defendants acted in concert, in agreement and in conspiracy with each other to deprive plaintiff, Watson of his constitutional rights because of his race." (Plaintiffs' Complaint ¶39).

Affidavits used to support a search warrant are presumed valid. Franks v. Delaware, 438 U.S. 154, 171, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978). The veracity of the Affidavit may only be attacked upon a showing of deliberate falsehood or reckless disregard for the truth by the affiant. Id. In the context of §1983 case, to survive summary judgment, the plaintiffs must demonstrate that a genuine issue of material facts exists as to whether the false information contained in the Affidavit was provided deliberately or with reckless disregard for the truth. Freeman v. County of Vexar, 210 F.3d 550 (5th Cir., 2000). To meet this burden, the plaintiffs must make a "strong preliminary showing" that the affiant made the misstatement or admission "with the intent to

mislead the Magistrate." United States v. Tomblin, 46 F.3d 1369, 137 (5th Cir., 1995) (quoting U.S. v. Colkley, 899 F.2d 297, 301 (4th Cir., 1990).

Other than the conclusory allegations contained in their Complaint, the plaintiffs have offered no evidence that there were any errors at all in the Affidavit.  The Court in Franks clearly puts the burden on the challenger to make a substantial showing of deliberate falsity or reckless disregard for the truth.  Franks, 438 U.S. at 171.  Watson has provided absolutely no evidence that the search warrant was predicated on either false information or in reckless disregard for the truth, his claim that his Fourth Amendment rights were violated must fail.  Furthermore, the sufficiency of a search warrant Affidavit is tested through the examination of the "totality of the circumstances." Illinois v.Gates, 462 U.S. 213, 230-31, 76 L.Ed. 2d 527, 103 S. Ct. 2317 (1983).  That case emphasized that Courts reviewing determinations made by Magistrates could accord them "great deference."  Id. at 236 (quoting, Spinelli v. United States, 393 U.S. 410, 419, 21 L.Ed. 2d 637, 89 S.Ct. 584 (1969). Furthermore, "probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest." Collins v. Nagel, 892 2d 489, 495 (6th Cir., 1989).

In the instant case, defendants, Kondon and Parks had received numerous complaints about the financial dealings of Tony's Tix.  These included bad checks, failure to deliver paid for services and making unauthorized charges against customers' credit cards.  Accordingly, the search warrant that was executed on Tony's Tix on February 11, 2000 was overwhelmingly supported by requisite probable cause.

Therefore, Count I of Antonio Watson's Complaint seeking relief for violations of his Fourth Amendment rights should be dismissed with prejudice.

**B.**   **Count I of Plaintiff Robert Kennedy's complaint seeking relief for violation of his Fourth Amendment rights should be dismissed with prejudice**

Plaintiff, Robert Kennedy alleges that Detective Anthony Ammaturo "knew that plaintiff, Kennedy did not make any said threat or was reckless in determining whether plaintiff, Kennedy made such threats concerning killing Detective Richard Kondon.  (Plaintiffs' Complaint ¶81).  Furthermore, plaintiff, Kennedy

alleges that the Abington Township Police Department offered to drop the pending charges against him in relation to his threats against Detective Kondon in return for help in investigating Antonio Watson.  This simply stretches the bounds of credulity.  Plaintiffs would have the Court believe that the Abington Township Police Department would allow a person who has made a threat to kill a fellow Police Officer to walk in exchange for testimony against Antonio Watson.  Regardless, the Abington Township Police Department had probable cause to effectuate the arrest of Robert Kennedy.

On July 26, 1999, Antonio Watson came to the Abington Township Police Department and reported that Robert Kennedy had threatened to kill Detective Richard Kondon.  (Attached as Exhibit "S").  On Thursday, July 22, 1999, Robert Kennedy said to Mr. Watson that he should invite Detective Kondon of the Abington Township Police Department to the Scoreboard during the evening hours and that "he won't come back out." Furthermore, Kennedy told Watson that "you know that FBI Agent that got killed on Delaware Avenue.  If that can happen to an FBI Agent, that can happen to cops too."  Robert Kennedy has an extensive criminal history and for that reason, among others, Detective Ammaturo swore out an Affidavit of Probable Cause to obtain an arrest warrant for Robert Kennedy. (Affidavit and Arrest Warrant Attached as Exhibit "W").

The Fourth Amendment to the United States Constitution generally prohibits a police officer from arresting a citizen without probable cause.  Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3rd Cir., 1995). The probable cause ordinarily necessary for a constitutionally proper arrest exists "when the facts and circumstances within the arresting officers' knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Id. at 483.  A plaintiff may succeed in a §1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: 1) that the police officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or admissions that create a falsehood in applying for the warrant; and 2) that "such statements or omissions are material, or necessary to the finding of probable cause."

Wilson v Russo, 212 F.3d 781, 786, 87 (citing Sherwood v. Mulvihill, 113 F.3d 396, 399 (3r Cir., 1997).

Other than the allegations made in the Complaint, the plaintiff, Kennedy has produced no evidence whatsoever that Detective Ammaturo knowingly and deliberately acted with a reckless disregard for the truth or made false statements or omissions that created a falsehood in applying for the warrant to arrest Robert Kennedy.  In effect, there has been no evidence introduced by Kennedy to prove or otherwise suggest that Detective Ammaturo lacked probable cause when he sought and secured an arrest warrant for Robert Kennedy.

Therefore, Count I of Plaintiff, Robert Kennedy's Complaint seeking relief for violation of his Fourth Amendment rights should be dismissed with prejudice.

**C.     Count I of all Plaintiffs seeking relief for violation of their Fourteenth Amendment rights against all defendants should be dismissed with prejudice**

All plaintiffs assert claims under 42 U.S.C. §1983 and the Fourteenth Amendment against Abington Township, the Abington Township Police Department, Chief William J. Kelly, Detective Richard Kondon, Detective John Parks and Detective Anthony Ammaturo.  Specifically, plaintiffs allege that "there exists within the Abington Township Police Department, an ongoing de facto governmental policy and/or custom of permitting police officers to submit to judicial officers, Affidavits of Probable Cause for search and arrest warrants, which contains statements said police officers know to be false or contain statements that have been made with reckless disregard for whether they are true or false."  (Plaintiffs' Complaint ¶103).  Furthermore, plaintiffs allege that the defendants, Abington Township, Abington Township Police Department and Chief William J. Kelly, fail to "curb the practice of Abington Township Police Officers, for training, supervision, investigation and discipline for discriminating against African Americans and those associated with African Americans is a cause of ongoing risk of harm to plaintiffs and others." (Plaintiffs' Complaint ¶106).  Further, plaintiffs allege that there is "an ongoing pattern and practice of discrimination against African Americans and of obtaining search and arrest warrants by submitting Affidavits of Probable Cause, which contain statements

known by defendants to be false or statements made with reckless disregard whether they are true or false." (Plaintiffs' Complaint ¶107).

A local government cannot be held liable on a failure to train theory for conduct that has been determined did not to violate the plaintiffs' constitutional rights. Grazier v. City of Philadelphia, 328 F.3d 120, 125 (3rd Cir., 2003).  (citing City of Los Angeles v. Heller, 475 U.S. 796 (1986) (per curiam).  Indeed, municipal liability will only lie where the municipal action actually caused an injury.  Id. at 124;  City of Canton, 489 U.S. 378, 390 (1989).

The Third Circuit the following requirements have been imposed on plaintiff seeking to recover against local governments on allegations of inadequate training:

> We have held that a failure to train, discipline or control could only form the basis for §1983 municipal liability if the plaintiff can show both contemporaneous knowledge of the incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate.

Montgomery v. DeSimone, 159 F.3d 120, 126 (3rd Cir., 1998); Friedman v. City of Allentown, 853 F.2d 1111, 1117 (3rd Cir., 1988); Colburn v. Upper Darby Township, 838 F.2d 663, 673 (3rd Cir.,. 1988).

As the Court observed in Brown v. Muhlenberg Township, 269 F.3d 205, 215, 216 (3rd Cir., 2001), the scope failure to train liability is a narrow one.  Consequently, in order to "survive summary judgment on a failure to train theory, the  plaintiffs must present evidence at the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymakers failure to respond amounts to deliberate indifference."  Id. at 216.

The Supreme Court set out the framework for establishing municipal liability on a failure to train theory in City of Canton v. Harris, 489 U.S. 378 (1989).  The City's failure to train its police officers must reflect a deliberate or conscious choice by policymaking officials, such that one could call the city's policy or custom.

The failure to train must "amount to deliberate indifference to the rights of persons with whom the police come into contact. Harris, 489 U.S. at 388; see also, Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 404, 137 L.Ed. 2d 626, 117 S. Ct. 1382 (1987). Moreover, the city's decisions must be "the moving force" behind an actual constitutional violation. Harris, 489 U.S. 389.

In the instant case, plaintiffs have not provided any evidence that the Abington Township Police Department has a custom or policy of violating the constitutional rights of African Americans. On the contrary, it has been established that the Abington Township Police Department has taken a special interest in preventing racial discrimination. This is evidenced by the previously mentioned Affidavits provided by the President of the Willow Grove Chapter of the NAACP, Donald Clark and Joanne Weaver Stroh, who is the Chairperson of the Human Relations Commission in the township. Chief William J. Kelly has also received awards from the Willow Grove NAACP and the United States Congress for his work in preventing racial discrimination. In sum, plaintiffs have not provided any evidence that the Abington Township Police Department has any custom, policy or practice that promotes racial discrimination against African Americans. To the contrary, the opposite has been proven.

There has been no violation of plaintiffs' constitutional rights in any way, shape or form in this case. Rather, at all times, Chief William J. Kelly, Detective Richard Kondon, Detective John Parks, Detective Anthony Ammaturo all acted in accordance with the protections afforded to the plaintiffs under the U.S. Constitution. No evidence has been produced to show otherwise because the complaint is completely without merit.

Therefore, Count I of Plaintiffs' Complaint seeking relief for violation of the Fourteenth Amendment should be dismissed against all defendants.

**D.** **Count I of Plaintiff's Complaint seeking relief for violation of 42 U.S.C. § 1985 should be dismissed with prejudice**

To state a claim under 42 U.S.C. § 1985(3) the plaintiff must allege:

(1) a conspiracy,

(2) that the conspiracy is motivated by racial or class based invidiously discriminatory animus;

(3) it must deprive one of equal protection of the law,

(4) that the conspirators committed some act in furtherance of the conspiracy; and,

(5) the plaintiff was injured in his person or property or deprived of a right or privilege as a United States citizen.

United Brotherhood Of Carpenters and Joiners of America Local 610 v. Scott, 463 U.S. 825, 828-829 (1983).

Moving Defendant asserts that there was never any conspiracy of any sort to deprive Plaintiffs their Constitutional Rights pursuant to 42 U.S.C. §1985 (3). Regardless, the case at bar fails to meet any of the requirements necessary to establish a cause of action pursuant to 42 U.S.C. § 1985(3).

It is a basic law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of an agent are the acts of the corporation. Scott v. Bristol, 1990 U.S. Dist. LEXIS 15313, 17 (1990). The intracorporate conspiracy doctrine was first applied to civil rights cases arising under § 1985(3) in Dombrowski v. Dowling, 459 F.2d 190 (7th Cir. 1972). The Court in Dombrowski established that "where challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will not normally constitute the conspiracy contemplated by [section 1985(3)]." Id. at 196.

Dombrowski has been extended to section 1985(3) claims asserted against municipalities and their public officials acting in their official capacities. See Buschi v. Kirven,  775 F.2d 1240, 1251-53 (4th Cir. 1985); Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir.), cert. denied, 439 U.S. 1003 (1978) (citing Girard v. 94th Street and Fifth Avenue Corp., 530 F.2d 66 (2d Cir.), cert. denied, 425 U.S. 974 (1976)); Royal v. City of Albuquerque, 653 F. Supp. 102, 107 (D. N.M. 1986); Barger v. City of Kansas, 620 F. Supp. 1432, 1435 (D.

Kan. 1985); Eggleston v. Prince Edward Volunteer Rescue Squad, Inc., 569 F.Supp. 1344, 1352 (ED. Va.

1983), aff'd without op., 742 F.2d 1448 (4th Cir. 1984); Buntin v. Board of Trustees of Virginia Supplemental

Retirement Sys., 548 F. Supp. 657, 660 (W.D. Va. 1982);

Becker v. Russek, 518 F. Supp. 1040, 1045 (W.D. Va. 1981), aff'd without op. 679 F.2d 876 (4th Cir. 1982);

Rivas v. State Bd. for Community Colleges and Occupational Ed., 517 F.Supp. 467, 472 (D. Col. 1981);

Hankins v. Dallas Indep. School Dist., 698 F. Supp. 1323, 1330 (N.D. Tex. 1988) (school and its official acting

within scope of their duties constitute single legal entity which cannot conspire with itself). The application of

Dombrowski in this context rests upon the notion that when township employees are sued in their official

capacity, the township itself is being sued, and a township cannot conspire with itself any more than a

corporation or a university. Scott v. Bristol, 1990 U.S. Dist. LEXIS 15313, 20.

 Plaintiffs raise the specter of racial animus repeatedly in their Complaint.  Specifically, the Plaintiffs

allege that the Abington Township Police Department and its officers have engaged in numerous acts of racism

that have caused injury to them.  Yet the APD came into contact with the Plaintiffs only because they had either

engaged in criminal behavior or consorted with people who engaged in criminal behavior.  The substance of the

criminal complaints against both Watson and Kennedy have been addressed at length elsewhere in this motion.

Regardless, the facts are clear that but for their own behavior Plaintiffs would not have had any interaction with

the Moving Defendants.

 All of the named Defendants are employees of Abington Township.  The law is clear that agents of

municipalities, acting in their official capacity, cannot conspire among themselves.  Plaintiffs have provided no

evidence that Moving Defendants ever acted outside of the scope of their official capacity.  Additionally, none

of the Moving Defendants conspired at any time let alone with any racial animus.  Plaintiffs have not

established any facts to support any racial animas of the Abington Police Department let alone a conspiracy to

deprive them of the protections provided by 42 U.S.C. §1985 (3).

Accordingly, Count I of the Plaintiff's Complaint seeking relief pursuant to 42 U.S.C. 1985 (3) should be dismissed with prejudice.

**F.**   **State Law Claims Should Be Dismissed Pursuant to 28 U.S.C. §1367(c)(3)**

28 U.S.C. §1367(c)(3) states:

> (c)  The district courts may decline to exercise supplemental jurisdiction over a claim under (a) if:
>
> > (3)  the district court has dismissed all claims over which it has original jurisdiction.

For the reasons described supra., there are no claims left that gives this Complaint original jurisdiction over the state law claims.

Therefore, all state law claims included in the Complaint should be dismissed with prejudice.

**G.**   **Count II of Plaintiffs' Complaint Against All Defendants Should Be Dismissed With Prejudice**

To state a claim of commercial disparagement, plaintiffs must allege that: 1) defendants published a false and disparaging statement concerning plaintiff's business; 2) defendants' intent was to cause plaintiffs pecuniary loss, or that defendants reasonably should have known that publication would cause plaintiffs' pecuniary loss; 3)  actual pecuniary loss by plaintiffs; and 4)  that defendants knew that the statement was false or  acted in reckless disregard to its truth. Pro Golf Manufacturing, Inc. v. Tribune Review Newspaper Company, 2000 Pa. Super. 273, 761 A.2d 553, 555-56 (Pa. Super. 2000).  Specifically, the plaintiffs state that the basis for this claim are the statements referred to in paragraphs 27 and 69 in Plaintiffs' Complaint. Paragraph 27 of Plaintiffs' Complaint is concerned with the statements made by Detective Richard Kondon in support of the search warrant that was executed on February 11, 2000.  Paragraph 69 is concerned with

statements that were allegedly said to Police Officers in the Abington Township Police Department to stay out of the Scoreboard Tavern because criminal activity occurred there.

The search warrant that was executed on Antonio Watson's place of business resulted in an agreement with the Commonwealth of Pennsylvania to provide restitution to complainants against Tony's Tix.  The agreement that Antonio Watson raised with the Commonwealth of Pennsylvania has not been honored.  As previously mentioned, Antonio Watson is scheduled for a hearing for a Motion for Contempt concerning his failure to provide restitution as per his agreement of September 5, 2001 with the Court of Common Pleas of Montgomery County.  This hearing will be held on November 5, 2004.  Plaintiffs have not proven that any portion of the Affidavit or search warrant that was issued to effectuate the search of Tony's Tix was false.  On that element alone, this Count should be dismissed.

However, the plaintiffs have not proven any point in the discovery process that the defendants had an intent to cause plaintiffs pecuniary loss or that the defendants reasonably should have known that the publication of the facts would cause plaintiffs pecuniary loss.  Even if moving defendants concede that a portion of either the search warrant or the Affidavit for the search warrant was incorrect, plaintiffs have not proven that the intent of defendants to cause plaintiffs pecuniary loss.  Accordingly, Antonio Watson's claim for commercial disparagement should be dismissed.

Plaintiffs have also not proven that they suffered pecuniary loss for the publication of either the Affidavit or the search warrant. Tony's Tix was not a successful enterprise.  At the time of the execution of the search warrant, Robert Kennedy had a lien against the sole computer of Tony's Tix.  Additionally, in December of 1999, Detective Richard Kondon discovered that Tony's Tix had a negative cash balance at its sole First Union account in Abington.  It can be fairly said that Tony's Tix was close to being out of business.  After all, it was Robert Kennedy who provided Detective Kondon with the information that Tony's Tix would soon be out of business.

The last element that the plaintiffs must prove in this case is that defendants knew that the statement was false or acted in reckless disregard to its truth. The statements were not false. Even if moving defendants concede that the statements were false, plaintiffs have not proven that either the defendants knew that they were false or that they acted in reckless disregard to its truth. Throughout the course of the discovery process, the plaintiffs have not proven anything that would support any claim against any of the defendants. This claim is no different.

Therefore, Count II of Antonio Watson's Complaint against all defendants seeking relief for commercial disparagement should be dismissed with prejudice.

Jerry Kelly alleges in paragraph 69 of his Complaint that the defendants started to falsely and recklessly communicate to Abington Township Police Officers that they were to stay out of the Scoreboard Restaurant and Tavern during their off duty hours because "said restaurant and tavern was being investigated for illegal activities." "This also caused the restaurant and tavern to lose a substantial amount of business." This is completely without merit.

The first element that the plaintiffs must prove in this case is that in this tort is that the defendants published a false and disparaging statement concerning the plaintiff's business. Throughout the course of the discovery process, there has been no evidence produced that Chief Kelly or anyone in a supervisory position directed the Abington Police Department to stay out of The Scoreboard Tavern and Bar. Accordingly, this cause of action fails.

The plaintiffs must also prove that the Abington Township Police Department and Chief Kelly intended to cause Jerry Kelly's pecuniary loss or that Abington Township or Chief Kelly reasonably should have known that publication would cause Jerry Kelly's pecuniary loss. There was no publication of any sort concerning The Scoreboard to Abington Township Police Officers. Regardless, even if there were, the plaintiffs have not proven that Chief Kelly had an intent to cause Jerry Kelly's pecuniary loss.

Jerry Kelly must also prove actual pecuniary loss.  The tax records that have been supplied to defendants in this case illustrate The Scoreboard Tavern was a failing business.  To intimate that Chief Kelly's directions to his Police Officers caused either financial harm and/or the failure of The Scoreboard Tavern or Bar is completely without merit.  It is highly unlikely that even if Chief Kelly ordered his men to eat there all the time whether The Scoreboard could have remained in business.

Even if Chief Kelly did make the statement, the Jerry Kelly fails to establish that Chief Kelly knew that the statement was false or acted in reckless disregard to its truth.  Chief Kelly never made a statement to the Police Department to stay out of The Scoreboard Tavern.  Regardless, even if he did, the plaintiffs have not proven that either the statement was false or that Chief Kelly acted in reckless disregard to its truth.

Therefore, Count II of Gerald Kelly's Complaint against all defendants should be dismissed with prejudice.

**H.**   **Count III of Antonio Watson's Complaint should be dismissed with prejudice**

Plaintiffs allege that moving defendants initiated and/or procured criminal proceedings against Antonio Watson without probable cause and/or primarily for purposes other than that of bringing an offender to justice.  Furthermore, plaintiffs allege that the criminal proceedings against Antonio Watson have been dismissed and terminated in his favor.  Under Pennsylvania Law, in order to prove a malicious prosecution claim, plaintiffs must prove that (1) defendants instituted the proceedings against him without probable cause and without malice; and (2) proceedings were terminated in their favor.  Douris v. County of Bucks, 2001 U.S. Dist. Lexis 9282, paragraph 34 (July 3, 2001, E.D. Pa.).  In a malicious prosecution action, the plaintiff has the burden of proving a lack of probable cause.  Cosmas v. Bloomingdale Brothers, Inc., 660 A.2d 83, 86 (Pa. Super. 1995).  Probable cause is defined as a reasonable ground of suspicions supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is guilty of the offense.  Id.  In certain instances, the defendant can introduce conclusive evidence of the existence of probable cause, thereby defeating

plaintiffs' claim of malicious prosecution.  In many states, one such instance is a plaintiff's conviction in the underlying criminal conviction.  Id.

Even if the conviction is later overturned, it is conclusive proof of the existence of probable cause unless the convicted party can show fraud or other undue influence at work in the conviction proceedings.  While a conviction can serve as conclusive evidence of the existence of probable cause, the action of a District Justice or Magistrate in holding the plaintiff over to be tried in Court is similarly conclusive.  Id.  (See also, Miller v. Pennsylvania Railroad Company, 89 A.2d 809, 813 (Pa. 1952).

"Where evidence of a holding over is not conclusive as to probable cause, but is weighty if impeached, comports with our policy on the tort of malicious prosecution.  Malicious prosecution involves a conflict between the interests of society and law enforcement as opposed to the individual interests in freedom from false accusation."  Cosmas v. Bloomingdales Brothers, Inc., 660 A.2d 83, 87 (Pa. Super., 1995).  It is often said that the interest of society in preserving order is the more importance of concern.  The Courts must be careful not to discourage lawful proceeding against those who are currently guilty.  At the same time, however, the general public is entitled to protection from abuse of authority and from the embarrassment, humiliation and expense of being wrongfully prosecuted for a crime.  Id.

In Cosmas, the plaintiff was an employee of Bloomingdales Brothers.  He purchased several items from Bloomingdales using a credit card in the name of Mr. John Ryan.  Bloomingdales' Security subsequently found that Mr. John Ryan had passed away two days before the plaintiff had made her purchase.  Plaintiff claimed that she was having a relationship with Mr. Ryan and that he had authorized her use of the credit card on several occasions.  Furthermore, she stated that various store personnel were aware of the relationship and of her prior use of Mr. Ryan's credit card.  Notwithstanding plaintiff's explanations, she was suspended and later fired from Bloomingdales.  She was charged with theft and a finding of probable cause was determined at the preliminary hearing.  Upon subsequent review, the District Attorney's Office decided to drop all of the charges against

plaintiff and her record was expunged.  Plaintiff subsequently filed a suit against Bloomingdales for malicious prosecution, defamation and interference with contractual relations.  The Court dismissed the malicious prosecution charge against Bloomingdales and stated that plaintiff had failed to meet her burden of establishing lack of probable cause.  Id.

In the instant case, plaintiff, Antonio Watson was arrested on August 19, 2000.  The evidence that resulted in his arrest was obtained pursuant to a search warrant signed by District Justice Joseph Dougherty on February 11, 2000.  (Attached as Exhibit "N").  The criminal complaint against Antonio Watson was dismissed pursuant to a Rule 586[1] Agreement between Antonio Watson and the Court on September 9, 2001.  To date, Antonio Watson has yet to meet the conditions of this Agreement and a Motion for Contempt has been scheduled for November 5, 2004 to resolve this failure to provide restitution.  (Affidavit of Marcy Toepel, Chief Deputy, Clerk of Courts, Montgomery County Court of Common Pleas attached as Exhibit "M").

It has been said that a conviction is sufficient to negate the element of a lack of probable cause.  To permit a convicted criminal defendant to proceed with the malicious prosecution claim, would permit a collateral attack on the conviction to the vehicle of a civil suit.  Most importantly, it has been noted that Courts will simply not tolerate inconsistent judgments.  Davidson v. Chubb/Pacific Indemnity Group, 493 F. Supp. 89, 90 (E.D. Pa. 1980)

Confusion arises, however, when an underlying criminal action is disposed of in some manner short of a judgment of guilty or not guilty.  It is clear that the civil plaintiff need not demonstrate that the charges were disposed of on the merit, but only that the disposition was "consistent with innocence or in other words, in a manner that is inconsistent with guilt."  Id.  Several examples of determinations which are short of

---

[1]Pennsylvania Rule of Criminal Procedure 586 provides in pertinent part: When a defendant is charged with an offense which is not alleged to have been committed by force or threat thereof, the court may order the case to be dismissed upon a motion and a showing that (1) the public interest will not be adversely effected; (2) the attorney for the Commonwealth consents to the dismissal; (3) satisfaction has been made to the aggrieved person or there is an agreement that the satisfaction will be made to the aggrieved person; and (4) there is an agreement as to who shall pay the costs. Pennsylvania Rule of Criminal Procedure 586.

"determinations on the merits," but which are nonetheless sufficiently favorable to allow the claim to move ahead are:  1)  a discharge by a Magistrate at the preliminary hearing; 2)  the refusal of a Grand Jury to indict; 3 the formal abandonment of the proceedings by the public prosecutor; and 4)  the quashing of an indictment Id.   A determination which is indecisive will not support the malicious prosecution claim.

Several examples of indecisive determination are: 1) a charge that is withdrawn pursuant to an agreement of the accused; 2)  a charge that is withdrawn out of mercy and/or accepted by the accused; 3)  entry of a plea of nolo contendere; or 4)  a pardon by the executive. A Rule 586 disposition is an agreement with the accused in which the charges are withdrawn.  Thus this falls under the indecisive determination category and does not allow for a malicious prosecution claim.  Plaintiffs' contention that they fell victim to a malicious prosecution claim is further undermined by the fact that he has not met the terms of the Rule 586 disposition.

Therefore, Count III of Antonio Watson's Complaint against moving defendants should be dismissed with prejudice.

**I.      Count III of Robert Kennedy's Complaint should be dismissed with prejudice**

Plaintiff, Robert Kennedy, alleges that moving defendants initiated or procured criminal proceedings against Robert Kennedy without probable cause and were primarily for purposes other than that of bringing an offender to justice.  Furthermore, Robert Kennedy alleges that criminal proceedings against him have been dismissed and terminated in his favor.  Under Pennsylvania Law, in order to prove a malicious prosecution claim, plaintiffs must prove that:  (1) defendants instituted the proceedings against them without probable cause and with malice; and (2) proceedings were terminated in their favor.  Douris v. County of Bucks, 2001 U.S. Dist. Lexis 9282, paragraph 34 (July 3, 2001, E.D. Pa.).  In a malicious prosecution action, the plaintiff has the burden of proving a lack of probable cause.  Cosmas v. Bloomingdales Brothers, Inc., 660 A.2d 83, 86 (Pa. Superior Court, 1995)  Probable cause is defined as a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is

guilty of the offense.  Id.  In certain instances, a defendant can introduce conclusive evidence of the existence of probable cause thereby defeating plaintiff's claim of malicious prosecution. In many states, one such instance is a plaintiff's conviction in the underlying criminal action.  Id.

Even if the conviction is later overturned, it is conclusive proof of the existence of probable cause, unless the convicted party can show fraud or other undue influence at work in the conviction proceeding.  While a conviction may serve as conclusive evidence of the existence of probable cause, the action of a District Justice or Magistrate in holding the plaintiff over to be tried in Court is similarly conclusive.  Id.  (See also, Miller v. Pennsylvania Railroad Company, 89 A.2d 809, 813 (Pa. 1952).

Where evidence of a holding over is not conclusive as to probable cause, but is weighty if impeached, it comports with our policy on the tort of malicious prosecution.  "Malicious prosecution involves a conflict between the interest of society and law enforcement as opposed to the individual interest in false accusation." Cosmas v. Bloomingdales Brothers, Inc., 660 A.2d 83, 87 (Pa. Super. 1995).  It is often said that the interest of society in preserving order is the more important concern.  Thus, we must be careful not to discourage lawful proceeding against those who are apparently guilty.  At the same time, however, the general public is entitled to protection from abuse of authority and from the embarrassment, humiliation and expense of being wrongfully prosecuted for a crime.  Id.

In the instant case, plaintiff, Robert Kennedy was arrested and charged with intimidation of witnesses or victims, terroristic threats, obstructing administration of law or other governmental functions and harassment. (Criminal Complaint and Investigative Report attached as Exhibit "X").  The charges were filed pursuant to statements made to the Abington Township Police Department by Antonio Watson.  This is the same Antonio Watson that is a co-plaintiff in this case.  Specifically, Antonio Watson told the Abington Township Police Department that Robert Kennedy told him that "invite Miller and Detective Kondon up to the Scoreboard on Thursday night and Kondon won't come out."  (Attached as Exhibit "S").  In the sworn Statement, Antonio

Watson assured the police that he was not making up any of this information and that he had been not been encouraged by Detective Kondon or any other member of the Abington Township Police Department to make this Statement.  Watson also said that Kennedy said, "You know that FBI Agent that got killed on Delaware Avenue.  If that can happen to an FBI Agent, then it can happen to cops too."

The criminal complaint against Robert Kennedy was never prosecuted because Antonio Watson could not be found to provide testimony against him.  Antonio Watson's testimony to the police was the sum and substance of the case.  As Kennedy's case progressed it became clear to the police that Antonio Watson was not a credible witness.  Nevertheless, the police still do believe that Robert Kennedy threatened Detective Kondon's life.  It was certainly reasonable for the police to take Antonio Watson's comments seriously when they were made.  There is no evidence that the defendants instituted the proceedings against Kennedy without probable cause.

The plaintiffs argue that the charges were instituted against Robert Kennedy because the police wanted to encourage Robert Kennedy to testify against Antonio Watson.  This, of course, belies the fact that Antonio Watson was the person who told them that Kennedy planned to kill Detective Kondon.  The facts simply do not mesh. Additionally, the plaintiff simply has not proven that the police secured the arrest warrant without probable cause.  The police had a signed statement from what they thought was a credible witness at the time the statement was made.  Probable cause is defined as "a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is guilty of the offense."  Cosmas at 86.  Antonio Watson's sworn statements were specific and believed to be credible.

Plaintiffs have not proven any racial animus or the existence of a conspiracy on the part of the police to charge Robert Kennedy for these crimes simply because they wanted a cooperative witness against Antonio Watson.  Rather, they needed Antonio Watson as the witness in order to prove their case.  It is simply not

credible for the police to be simultaneously conspiring against Antonio Watson and then relying on him to prove a charge that Robert Kennedy was conspiring to kill a fellow officer.  Put simply, the Plaintiffs simply have not met their burden of proof.

Therefore, Count III of Robert Kennedy's Complaint against moving defendants should be dismissed with prejudice.

**J.**   **Count IV of Plaintiffs' Complaint Seeking Relief Against All Defendants For Intentional Infliction of Emotional Distress Should Be Dismissed With Prejudice**

Plaintiffs allege that "the conduct of all of the defendants were so outrageous as to transcend the limits of human decency and constituted the common law tort of intentional infliction of emotional distress." (Plaintiffs' Complaint ¶124).  Additionally, plaintiffs allege that "the defendants knew or should have known that directions would or probably would inflict extreme stress upon the plaintiffs."  (Plaintiffs' Complaint ¶125). None of these allegations have been proven by the plaintiffs in discovery.

To state a claim for intentional infliction of emotional distress, a plaintiff must allege: 1)  extreme and outrageous conduct by defendant; 2)  that it is intentional or reckless; 3)  that causes emotional distress, and 4) that the emotional distress is severe. Weinstein v. Bullick, 827 F. Supp. 1193, 1203 (E.D. Pa. 1993) citing Silver v. Mendel, 894 F.2d 598, 606 (3rd Cir., 1990).

The only conduct that the defendants engaged in was lawful police work.  It was neither extreme nor outrageous.  On the contrary, in light of the numerous complaints that were filed against Mr. Watson, the police showed tremendous restraint in their interaction with him.  In terms of Gerald Kelly, there was no conspiracy to adversely effect his business by conducting DUI checks or underage drinking sweeps in and around his business.  Rather, it has been proven that these checks were random.  It had nothing to do with Gerald Kelly's friendship with Antonio Watson whatsoever.  Robert Kennedy's allegation that he had been the victim of extreme and outrageous conduct at the hands of the Abington Township Police Department and the other defendants is ridiculous.  Robert Kennedy threatened the life of Detective Richard Kondon of the Abington

Township Police Department.  The Abington Township Police Department was told by Antonio Watson that Robert Kennedy was planning to kill Detective Richard Kondon.  Pursuant to Antonio Watson's statement to the police, Robert Kennedy was arrested.  This conduct was neither extreme nor outrageous by the standards of the tort of intentional infliction of emotional distress.  In fact, none of the conduct that the defendants engaged in relation to the plaintiffs was extreme or outrageous by any standard.  On this fact alone, this Complaint should be dismissed against all defendants.  However, the plaintiffs have failed to prove the other three elements of intentional infliction of emotional distress.

Plaintiffs must also establish that the conduct itself was intentional or reckless.  Furthermore, the plaintiffs must establish that the intentional or reckless conduct caused emotional distress that was severe.  Nowhere in the discovery process has the plaintiffs proven that any of the plaintiffs suffered emotional distress let alone emotional distress that was severe and that the defendants were responsible for.  In sum, the inclusion of the intentional infliction of emotional distress in this Complaint is completely without merit.  The evidence in this case is overwhelming and clear that the defendants did nothing wrong in their interactions with the plaintiffs.  Accordingly, the claim for intentional infliction of emotional distress brought by all plaintiffs against all defendants should be dismissed.

Therefore, Count IV of the Plaintiffs' Complaint against all defendants should be dismissed with prejudice.

**K.**     **Plaintiffs' Claim for Punitive Damages Against All Defendants Should Be Dismissed With Prejudice**

Under 42 U.S.C. §1983, plaintiffs may seek punitive damages against defendants in their individual capacity.  However, "in order to obtain such damages, plaintiff must establish facts of record that prove the individuals knowingly and maliciously deprived the plaintiffs of their civil rights."  Ruiz v. Philadelphia Housing Authority, 1998 U.S. Dist. Lexis 3925 (E.D. Pa. March 17, 1999).  The Third Circuit has stated that:

> For a plaintiff in a §1983 case to qualify for a punitive award,
> defendants' conduct must be at a minimum reckless or callous.
> Punitive damages might also be allowed if a conduct is
> intentional or motivated by an evil motive, but the defendants'
> action need not necessarily meet this higher standard.

Savarese v. Agriss, 883 F.2d 1194, 1204 (3rd Cir., 1989).

The Supreme Court of Pennsylvania has adopted the Restatement (Second) of Torts, §908(2), which permits damages for "conduct that is outrageous because of the defendants evil motive or his reckless indifference to the rights of others." Rizzo v. Haines, 520 Pa. 484, 555 A.2d 58, 69 (Pa., 1989) (quoting Rest. (2d) Torts §908(2)). The proper focus is on the act itself together with all of the circumstances including motive of the wrongdoer and the relations between the parties…(Rizzo, 520 Pa. at 555). Further, a Court may award punitive damages only "if the conduct was malicious, wanton, reckless, willful or oppressive." Id. It is clear from the evidence that none of the defendants engaged in any conduct that would subject the plaintiffs to a damage award let alone acts sufficient to allow for punitive damages.

Detectives Kondon and Parks executed a search warrant after numerous complaints had been filed against Antonio Watson and Tony's Tix. The subsequent arrest of Antonio Watson was at the direction of Detective Sgt. William Holt, who is an African American. Detective Anthony Ammaturo arrested Robert Kennedy after Antonio Watson had told the Abington Township Police Department that Robert Kennedy was planning to kill Detective Richard Kondon. Plaintiffs were not able to establish that Chief Kelly was involved at all in the investigation of the Plaintiffs. None of the Plaintiffs have provided any evidence that the defendants had done anything wrong let alone provided evidence that would allow for punitive damages.

Therefore, all of the plaintiffs' claims for punitive damages directed against all of the defendants should be dismissed with prejudice.

WHEREFORE, moving defendants, Abington Township, Abington Township Police Department, Chief William J. Kelly, Richard L. Kondon, John Parks and Anthony Ammaturo respectfully request that this Honorable Court grant Moving Defendants summary judgment together with all fees and costs and dismiss any and all claims against them with prejudice.

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN


  s/JS1015
JOSEPH J. SANTARONE, JR., ESQUIRE
Attorney for Defendant
Suite 1002, One Montgomery Plaza
Norristown, PA   19401
610-292-4444 (Phone)
610-292-0410 (Fax)
jsantarone@mdwcg.com
PA45723

**MARSHALL, DENNEHEY, WARNER,**
**COLEMAN & GOGGIN**
**BY:** Joseph J. Santarone, Jr., Esquire
ID#  45723
Suite 1002, One Montgomery Plaza
Norristown, PA   19401
(610) 292-4444

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTONIO D. WATSON AND TONY TIX, INC., | : | NO:  01-CV-5501 |
| GERALD W. KELLY, JUST JERRY'S, INC., | : | |
| AND ROBERT KENNEDY | : | |
| | : | |
| V. | : | |
| | : | |
| ABINGTON TOWNSHIP, ABINGTON | : | |
| TOWNSHIP POLICE DEPARTMENT, WILLIAM | : | |
| J. KELLY, CHIEF, DETECTIVE RICHARD | : | |
| KONDON, DETECTIVE JOHN PARKS, AND | : | |
| DETECTIVE ANTHONY AMMATURO | : | |

## CERTIFICATE OF SERVICE

I, Joseph J. Santarone, Jr., Esquire, do hereby certify that a true and correct copy of Defendants' Motion for Summary Judgment, was electronically filed with the Court on September 30, 2004   and  is  available  for  viewing and downloading from the ECF System.

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN


 s/JS1015
JOSEPH J. SANTARONE, JR., ESQUIRE
Attorney for Defendant
Suite 1002, One Montgomery Plaza
Norristown, PA   19401
610-292-4444 (Phone)
610-292-0410 (Fax)
jsantarone@mdwcg.com
PA45723

DATE: September 30, 2004